IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JARED ALLEN WHITE | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| Vs | § | No. 4:13-cv-13-3737 |
| | § | |
| | § | |
| COUNTY OF HARRIS and | § | |
| | § | |
| Defendant | § | JURY TRIAL DEMANDED |

### PLAINTIFF'S ORIGINAL COMPLAINT

TO THIS HONORABLE COURT:

Plaintiff JARED ALLEN WHITE (WHITE) complains of Defendant THE COUNTY OF HARRIS (HARRIS) for cause of action and respectfully show this Honorable Court the following:

### Introduction

1. The Taser is an "electro muscular disruption weapon" supposedly designed to incapacitate without causing serious physical injury or death. The Taser delivers a paralyzing 50,000 volt shock to the body through metal probes attached to twenty-one foot wires that are fired from the Taser using a nitrogen propellant. The Taser is marketed as an electronic defense weapon. It has routinely been said y experts that policy should not Taser people who simply appear confused and may be slow to comply with requests. Importantly, Tasers were not designed to be used as a first line of defense against non-dangerous or non-threatening individuals. Tasers were instead intended to be used on suspects who act out in a violent fashion, or present a danger to themselves, or others. Tasering inappropriately, as

1

an offensive means rather than as a necessary defense to ensure the safety of the suspect, officers, and bystanders, constitutes the use of unnecessary or excessive force.

2. JARED ALLEN WHITE, as a citizen of the United States, had the right to life, liberty and the pursuit of happiness. On September 29, 2012, several Harris County Deputies and Harris County Constables, took away these rights when they, without provocation or cause, shocked WHITE numerous times with a Taser, proximately causing serious injuries. WHITE's life and liberty were stolen from him due to an unjustifiable lack of sufficient policies and procedures by the very municipal government supposedly there to protect him.

**Parties**

3. WHITE is a citizen of the State of Texas.

4. Defendant, HARRIS controls and is responsible for the actions of the Harris County Sheriff's Department and Harris County Constables.

5. Defendant HARRIS controls and is responsible for the actions of the Harris County Sheriff's Department its deputies and Harris County Constables and its constables. The County operates pursuant to the Constitution and the laws of the State of Texas. The County of Harris may be served through the County Attorney. It is the County's customs, practices and policies, or lack thereof that contributed to WHITE's injuries. Further HARRIS's deliberate indifference to the need for adequate training also contributed to WHITE's injuries.

## Jurisdiction

6. This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. §1331 because of least one of WHITE'S claims arises under the Constitution and laws of the United States.

7. Venue is proper pursuant to 28 U.S.C. §133(a) (2) in that WHITE's claim arise from events taking place within this judicial district, and this division.

## Statement of Facts

8. On September 29, 2012 a Harris County Constable received a report that a man was waking in the middle of the feeder road in the 24700 block of Tomball Parkway.

9. According to reports, the officers were initially concerned for WHITE's safety, and asked WHITE if they needed to call an ambulance. Based on his erratic behavior, the officers believed that WHITE was under the influence of drugs. Unfortunately, concern for WHITE's well-being quickly morphed into aggression. When WHITE demonstrated behavior that was perceived by the Officers to be aggressive, nonresponsive and noncompliant, rather than check his medical condition or deal with him in a less aggressive manner, the officers instead proceeded to hogtie and shock WHITE multiple times with their Tasers. The Tasers were supplied by their respective employers.

10. At no time were the officers ever in danger. None had a reasonable concern for their safety, WHITE's safety, or the safety of others. The officers laughed and thought it was hilarious watching WHITE being tasered and falling on his face with his hands handcuffed behind his back.

11. The officers found the taserering of WHITE so hilarious that they videoed WHITE with his arms handcuffed behind his back and while he was standing resulting in

WHITE falling face down on the pavement. The officers videoed themselves laughing at WHITE as he fell face down on the pavement.

12. WHITE suffered serious injuries as a result of being shocked by Tasers.

13. Most police forces across the country have formalized training in the use of Tasers. Such training typically requires that officers be certified before they are authorized to use Tasers. They also require that users and instructors be recertified periodically (usually every year for users and every two years for instructors).

14. Neither does the HARRIS have adequate policies or procedures in place in the use of Tasers. Many other policy forces do. Such Taser use protocols include several key tenants, including:

    a. Policy should not Taser people who simply appear confused and may be slow to comply with requests.

    b. Tasers are not to be used as a first-line of defense against non-dangerous or non-threatening individuals.

    c. Tasers are not to be used on suspects who act out in a violent fashion, or present a danger to themselves, or others.

    d. Tasering inappropriately, as an offensive means rather than as a necessary defense to ensure the safety of the suspect, officers, and bystanders, is unnecessary.

15. And, most policies include the following guidance permitting the use of Tasers only in the following instances:

    a. When a person exhibits violent or potentially violent behavior that threatens the safety of others and attempts to subdue by conventional means have been or appear too unlikely to be effective;

    b. When it is unsafe to get within contact range of the subject;

    c. When the use of deadly force is justified and an opportunity exists to use the Taser, deploy the Taser if available; and

      d.      To restore or maintain order during prison disturbances;

      e.      To restore or maintain order during very violent civil disturbances where innocent people may be rescued or where policy are confronted with a level of force likely to cause serious physical injury such as Molotov cocktails being thrown or dangerous weapons or instruments are being used; or

      f.      Subdue vicious animals.

16. The International Association of Chiefs of policy ("IACP") recommends that a police force have in place a policy on the use of Tasers that, at the least, concerns the following factual situations:

      a.      Fleeing suspects and, if so, under what circumstances;

      b.      Persons with known or visible impairments indicating compromised health;

      c.      Mentally challenged persons or vulnerable populations (such as children, the elderly, and pregnant women); or

      d.      People to force compliance.

17. The IACP also recommends that departments have in place comprehensive training programs on electronic defense weapons, including testing, certification, and recertification procedures. IACP also recommends that before arming officers with the weapons, departments should ensure that officers achieve technical proficiency in the use of weapons and understand department policies and procedures governing them. According to the IACP instructors should teach officers about:

      a.      the capabilities and limits of the technology in terms of its effectiveness;

      b.      the need for sound justification when discharging the weapons;

      c.      proper incident-reporting procedures; and

        d.    the manufacturer's guidelines for maintaining and calibrating weapons to ensure that they perform as intended with regard to (a) incapacitating a target and (b) recording incidents for report verification and validation purposes.

18.    The IACP further recommends that instructors lessons include:

        a.    Lessons and "simulations structured for situations where less-lethal force options are chosen";

        b.    "Hands-on exercises using test cartridges and foil targets that simulate human subjects";

        c.    "scenario-based exercises"; and

        d.    Written tests.

19.    Many police departments also have policies prohibiting the use of Tasers on those suspected of being under the influence of drugs.

20.    Tasers and stun guns are high voltage, low-amperage devises that cause involuntary muscle contractions, loss of body control, and extreme pain and fatigue. The Taser delivers a paralyzing 50,000 volt shock to the body through metal probes attached to a 21-foot wires that are fired from the Taser using a nitrogen Propellant. When the Taser is fired, the probes penetrate the skin or up to 1" of clothing per probe to deliver a shock.

21.    The use of Tasers have been linked to various physiological affects including cardiac arrest, respiratory failure, malfunction of pacemakers, damaged eyes, injury to the central nervous system and death.

### Causes of Action

**42 U.S.C. § 1983 and Violations of the 4th and 14th Amendments to the United States Constitution—Unconstitutional Custom, Policy, or Practice of County of Harris.**

6

22. Defendant HARRIS deprived WHITE of his fourth and fourteenth amendment rights to freedom from excessive force and freedom from bodily intrusion by failing to provide property supervision, policy and/or training to prevent the officers' use of excessive force, as described *supra*.

23. Additionally, HARRIS had a general policy, custom pattern, or practice of not disciplining police officers for the use of excessive force, thereby sanctioning the police and sheriff officers' actions, which amounted to deliberate indifference.

24. HARRIS also had an unconstitutional policy, or custom or practice, whereby they would use Tasers on nonviolent, nonthreatening individuals, when such individuals posed no threat to the officers, bystanders, or even themselves. The application of such policy, or lack thereof, caused WHITE's injuries.

25. HARRIS had an unconstitutional custom or practice of using Tasers on those nonviolent and nonthreatening individuals under the influence of drugs. The application of such custom or practice caused WHITE's injuries.

26. HARRIS is liable for the constitutional torts of their officers, as described supra, because Defendant sanctioned the following customs, practices or policies, or acted with deliberate indifference to the officers' conduct:

    (A) Using excessive force to carry out otherwise routine arrests or stops, contrary to written policy and consistent with and tacitly approved custom or practice;

    (B) Using excessive force when such force is not necessary or permitted by law:

    (C) Ignoring the serious need for training and supervision of officers regarding the use of force, despite being aware of numerous other incidents;

 (D) Ignoring the serious need for training and supervision of officers regarding the use of taser weapons;

 (E) Failing to adequately supervise and observe its officers;

 (F) Failing to adequately train officers regarding the availability of alternative means of detaining persons other than through the use of force or deadly force;

 (G) Failing to adequately train officers regarding the proper use of taser weapons, including the risks involved in their use.

27. At the time officers tasered WHITE, they were acting pursuant to an official County policy, practice, custom and procedure overlooking and/or authorizing police officers' use of force HARRIS acted with deliberate indifference to either the lack of a policy, or the custom and practice of ignoring any such policy in place.

28. As a result, the HARRIS's policy of overlooking and covering up police brutality was a direct cause of Plaintiff's injuries. In particular, HARRIS's policy caused deprivation of WHITE's constitutional right to be free from objectively unreasonable, excessive force or intrusion under the Constitution of the United States.

### Prayer

For these reasons, WHITE asks HARRIS be cited to appear and answer, and that they have judgment against HARRIS for the following:

a. Compensatory damages in an amount to be determined according to proof at trial, but sufficient to compensate for the WHITE's injuries;

b. Costs of suit necessarily incurred herein;

c. Attorney's fees and costs pursuant to 42 U.S.C. 1988;

d. Such further relief as the Court deems just or proper.

Respectfully submitted,

LAW OFFICES OF RAY SCHINDLER

_____
Ray Schindler
Texas Bar No. 17749400
333 Simonton St., Suite 130
Conroe, Texas 77301-2667
(936) 494-1531; (936) 441-5900
FACSIMILE (936) 494-1532

ATTORNEY FOR PLAINTIFF
JARED ALLEN WHITE